AO 106 (Rev. 04/010) Application for Search Warrant        AUTHORIZED AND APPROVED/DATE: _____ 6-11-19

# UNITED STATES DISTRICT COURT

### FILED

for the

_____ WESTERN _____ DISTRICT OF _____ OKLAHOMA JUN 11 2019

CARM... ... A READER-SHIN
CLERK, U.S. DISTRICT COURT
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No: M-19-317-SM |
| A 2015 Royal Travel Trailer Bearing | ) |
| Oklahoma Tag EKH-589, VIN: | ) |
| 5CZ200R37F1124066, Parked at 1017 N. | ) |
| Waverly Street, Lot #15, Ponca City, OK, | ) |
| a Recreational Vehicle (RV) Park Otherwise | ) |
| Known as Ponca City RV Park | ) |

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following [Person or Property?] *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is incorporated by reference herein.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated herein.

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
☒ evidence of the crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841(a)(1) | Manufacturing of a Controlled Substance |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 333(e) | Distribution of Human Growth Hormone |

The application is based on these facts:

See attached Affidavit of Task Force Officer Jonathan Cordell, Drug Enforcement Administration, which is incorporated by reference herein.
☐ Continued on the attached sheet(s).
☐ Delayed notice of [No. of Days] days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_____
*Applicant's signature*

Jonathan Cordell
Task Force Officer
Drug Enforcement Administration

Sworn to before me and signed in my presence.

Date:   June 11, 2019

_____
*Judge's signature*

City and State:   Oklahoma City, Oklahoma

Suzanne Mitchell, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A 2015 ROYAL TRAVEL TRAILER BEARING OKLAHOMA TAG: EKH 589, VIN: 5CZ200R37F1124066, PARKED AT 1017 N. WAVERLY ST, LOT #15, PONCA CITY, OK, A RECREATIONAL VEHICLE (RV) PARK OTHERWISE KNOWN AS PONCA CITY RV PARK | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jonathan Cordell, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for an off-white 2015 Royal brand camper/recreational vehicle, bearing Oklahoma tag: EKH-589, VIN: 5CZ200R37F1124066 in Kay County, State of Oklahoma, parked at 1017 N. Waverly Lot #15, Ponca City, Kay County, Oklahoma, in the Western District of Oklahoma (**SUBJECT PREMISES**). The property to be searched is described in the following paragraphs and in Attachment A. The information to be seized is described in Attachment B. This affidavit is made in support of an application for a search warrant under Federal Rule of Criminal Procedure 41.

2.      I am an Investigator with the District 23 Drug and Violent Crime Task Force, currently assigned as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), United States Department of Justice, and have served in that

capacity since May 2019.  As such, I am an investigative and law enforcement officer of the United States authorized to conduct investigations of, and to make arrests and seizures for, offenses enumerated in the Controlled Substances Act, Title 21, United States Code.

3.      I am currently assigned to the Tactical Diversion Squad (TDS) at the Oklahoma City District Office (OCDO) located in Oklahoma City, OK.  In December 2016, I completed approximately eighteen (18) weeks of training at the Counsel on Law Enforcement Education and Training (CLEET) Basic Academy in Ada, Oklahoma. In March 2018, I completed an Advanced Criminal Interdiction course in Oklahoma City, OK, that instructed your affiant on narcotics investigations, interviews and interrogation, proper search and seizure, and arrest procedures. In March 2019, I completed a Meth Investigations course in Oklahoma City, OK, that instructed your affiant in narcotics investigations, use of confidential sources, and surveillance.   Prior to being assigned as an Investigator with the District 23 Drug and Violent Crime Task Force, I was a police officer with the Wewoka Police Department for two years and the Sac and Fox Nation Police Department for one year. I have experience investigating many types of criminal conduct.

4.      During my career as a Police Officer, I have investigated violations of the Controlled Substances Act involving illegal narcotics trafficking.  Through these investigations and the training mentioned above, I have become familiar with investigative methods and techniques regarding drug trafficking.  I am familiar with and

2

have participated in standard methods of investigation, including, but not limited to, visual surveillance, questioning witnesses, the use of search and arrest warrants, the use of informants, the use of electronic surveillance, and undercover operations. I am familiar with the methods of operation and terminology used by drug traffickers. I have experience debriefing defendants, witnesses, confidential sources, and other persons who have knowledge of the distribution and transportation of controlled substances. I know from training, experience, and experiences related to me by other agents that persons involved in drug trafficking frequently utilize tablet and/or encapsulating presses to further the distribution of illicit and/or counterfeit illicit substances.

5.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. As a Task Force Officer with the DEA, I am vested with the authority to investigate violations of Title 21 of the United States Code. The facts contained in this affidavit are based upon my own personal observations; reports and information provided to me by other law enforcement agents or government agencies; other documents obtained during the course of the investigation; interviews with witnesses; and my training and experience.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 333(e), 841(a)(1) and 846 have been committed by Patrick L. TRAVIS and Miranda N. RHYNARD. There is also probable cause to search an off-white 2015 Royal brand

3

camper/recreational vehicle, bearing Oklahoma tag: EKH 589, VIN:

5CZ200R37F1124066 in Kay County, State of Oklahoma, parked at 1017 N. Waverly

Lot #15, Ponca City, Kay County, Oklahoma, in the Western District of Oklahoma

(**SUBJECT PREMISES**) described in Attachment A, for evidence, instrumentalities,

contraband, and/or fruits of these crimes as further described in Attachment B.

## FACTUAL BACKGROUND

7.      On or about October 17, 2018, US Customs and Border Protection Officer

R. Scott Clutter reported to DEA Headquarters the discovery of an encapsulating

machine and a bulk shipment of empty capsules addressed to TRAVIS at 2360 E. Tower

Rd, Ponca City, Oklahoma 74604, via interdiction of a FedEx package sent from China.

On October 26, 2018, this information was passed via email to the DEA-OCDO TDS

from DEA Headquarters, Chemical Unit, Import, Export and Chemical Section,

Diversion Control Division.  Since this time, the DEA-OCDO has been investigating the

drug trafficking activity of TRAVIS.

8.      Encapsulating machines are machines that are used to create pills.

Specifically, encapsulating machines are designed to fill hard or soft gelatin capsules

with a number of substances, including powders.  A check of State of Oklahoma

databases suggests that TRAVIS has no medical licenses that might explain his need for

or possession of an encapsulating machine nor did TRAVIS register the machine as per

21 U.S.C. § 830(b)(1)(D) and 21 C.F.R. § 1310.05(c).  The failure to make a required

report is a violation of 21 U.S.C. § 842(a)(10), and the encapsulating machine was subjected to forfeiture under 21 U.S.C. § 881(a)(9).

9. Based on open-source research, TRAVIS and RHYNARD are the owners of an internet-based company identified as SWOLESCRIPTZ RESEARCH LAB (SWOLESCRIPTZ), a "vitamin" and "supplement" distribution company that purported to sell Selective Androgen Receptor Modulators (SARMS), Viagra, and supplements advertised as muscle building substances. In 2018, law enforcement observed on SWOLESCRIPTZ's website, swolescriptz.com, advertisements for Viagra and Cialis, among a variety of other substances. Both Viagra and Cialis require a prescription and are not available over the counter. More recently, and subsequent to the consent search described below, SWOLESCRIPTZ began operating a second website, Swole-rx.com.

10. On November 1, 2018, investigators traveled to Ponca City, Oklahoma, to make contact with TRAVIS and inquire as to his purpose for ordering gelatin capsules and the encapsulating machine. Investigators met with TRAVIS at the gated entrance of 2360 East Tower Road. TRAVIS was advised that his shipment of the encapsulating machine had been interdicted and the reason for the interdiction. TRAVIS was asked about his activities surrounding the purchase of the encapsulating machine and gelatin capsules (TRAVIS was shown the items during the conversation). TRAVIS related the following information.

11. TRAVIS stated that he and RHYNARD owned SWOLESCRIPTZ and had just gotten the company established in September of 2018 (open source records indicated

5

that SWOLESCRIPTZ had business activity as far back as July 2018). TRAVIS

informed investigators that SWOLESCRIPTZ manufactured health supplements and that

he had ordered the gelatin capsules and the encapsulating machine because customers

preferred gelatin capsules. TRAVIS said he paid $1,000.00 for the encapsulating

machine. TRAVIS indicated he utilized a company called CapsulCN.com to order the

encapsulating machine and paid for it via PayPal, using an account under his name

"Patrick TRAVIS."

12.     While investigators were speaking with TRAVIS, RHYNARD arrived at

the location in a white Toyota Prius. Investigators approached RHYNARD as she was

exiting her vehicle and asked her about the manufacturing activities of TRAVIS and

SWOLESCRIPTZ. RHYNARD explained that she and TRAVIS were partners and that

SWOLESCRIPTZ was doing well enough that she and TRAVIS had quit their

construction jobs in March (2018) and only worked selling supplements using

SWOLESCRIPTZ since that time.

13.     RHYNARD indicated that they had just purchased an encapsulating

machine that is in transit in Tennessee. Investigators explained that the encapsulating

machine and the gelatin capsules were present and had been intercepted by law

enforcement. RHYNARD indicated that she had a chemical compound that had also

been stopped in transit in "Kentucky or Tennessee" and that she and TRAVIS had been

waiting on its delivery "forever." RHYNARD indicated that the products they purchase

overseas come with a Certification of Analysis (COA) to confirm the chemical make-up

6

of the items purchased. RHYNARD told investigators that they also had a tableting

machine (a tableting machine is a pill press, in which powder is compressed into tablet

form) currently at their location. RHYNARD indicated that their manufacturing

standards now are good but they wanted to expand the facility so they can improve on

their "specs" (specifications of the products).

14.     RHYNARD told investigators that SWOLESCRIPTZ has an Instagram

account and a website. RHYNARD stated that the goal she and TRAVIS shared was to

stop with the production of tablets (and the resulting costs associated with paying for the

binding agent). RHYNARD said she and her customers would prefer the gelatin

capsules. RHYNARD remarked that she worked on the distribution end of the company

and that TRAVIS worked on the manufacturing part of the operation.

15.     RHYNARD was asked about the promotion of sales and production of

"Viagra." RHYNARD stated, "Its Viagra." RHYNARD said that most of their products

come from various overseas vendors and that she and TRAVIS do not have any license or

trademark permissions to sell "Viagra" or any permission to use that name on their

labeling. RHYNARD was asked if they had any Viagra up at the house. RHYNARD

indicated she was unsure because she thought they had recently sold out of their supply.

RHYNARD said that Viagra has not done very well and that they have only sold

approximately 200 to 300 bottles since March 2018. RHYNARD stated that each bottle

contain 30 tablets per bottle at 25 milligrams per tablet which is a "thirty day" supply.

16.     RHYNARD was asked if she had records of those to whom they have sold Viagra. RHYNARD indicated that she and TRAVIS used to keep track of their sales on a paper ledger, which has since been discarded. Now they track their sales through the website stamps.com. RHYNARD said that using the website is easier to print labels and ship items. She continued to explain that business records of the product recipients are kept in their stamps.com account and that the SWOLESCRIPTZ website tracks customer orders as well. RHYNARD stated that she and TRAVIS are the website administrators for SWOLESCRIPTZ.

17.     RHYNARD was asked if she would consent to a search of the property, understanding that any Viagra found and the tablet press would have to be seized. RHYNARD consented to a search stating, "Y'all can go up." RHYNARD agreed to give investigators access to a cargo trailer containing the tableting machine and the area where they make their products. RHYNARD entered a nearby trailer/recreational vehicle to retrieve the keys to a cargo trailer identified as the location of their business operation. This trailer/recreational vehicle was later observed at a different location and identified as the **SUBJECT PREMISES**.

18.     Upon locating the keys inside the trailer/recreational vehicle, RHYNARD provided the keys to the locked cargo trailer to TRAVIS. TRAVIS then walked around to the rear of the cargo trailer, unlocked it, and lowered the rear ramp-styled doorway. TRAVIS advised investigators that in the back right on a lower shelf of a table work area there was a firearm (seized as part of this investigation).

8

19.     Upon searching the cargo trailer, investigators discovered three pill presses and numerous powders and substances in various parts of the trailer.  Two of the presses were large, electric tabletop pill presses (the type described by RHYNARD earlier) and one of the presses was a hand crank table top pill press.  There were several pill bottles on the table, some of which had SWOLESCRIPTZ labels on them with "Viagra" as the contents.  A large number of bags of powder from China, as well as pills and other powder from unknown sources, were discovered in the trailer and seized.  In addition, investigators seized vials of a liquid purported to be steroids and photographed a large number of needles that could be used to administer the controlled substance.  All total, there were 87 exhibits of drug evidence and 22 exhibits of non-drug evidence seized from the trailer.  Multiple exhibits have been confirmed to be anabolic steroids, a Schedule III Controlled Substance, through laboratory tests.  Investigators also discovered a handwritten ledger that contained notes on how to manufacture steroid pills—i.e., the ratio of steroids to filler products and the number of pills that could be manufactured based on a specified amount of steroid product.[1]

20.     Following the search and seizure described above, TRAVIS and RHYNARD have continued the operation of SWOLESCRIPTZ. On or about November 21, 2018, a DEA form 452 was completed in DEA electronic systems for the registration

---

[1] On June 4, 2019, a Federal Grand Jury returned an indictment against TRAVIS and RHYNARD for alleged criminal violations that occurred between March 2018, and November 1, 2018. This indictment is currently under seal.

9

of an encapsulating machine sold to SWOLE RX from SWOLESCRIPTZ, both of 2360

E. Tower Road, Ponca City, OK 74604.  Record of the registration was made on

November 27, 2018.

21.     According to the current SWOLESCRIPTZ website and open-source

research, TRAVIS and RHYNARD have changed the name of their company to

SWOLE-RX.  On the website and/or their respective social media websites, photos and

videos of TRAVIS and/or RHYNARD continue to distribute various products meant to

promote muscle growth and limit body fat. The products offered on both

Swolescriptz.com and Swole-rx.com are similar to the products offered for sale prior to

the search and seizure described above. While Clenbuterol is still offered for sale, Viagra

is no longer listed.  Clenbuterol is described on open source websites as "banned in the

US" but utilized in "animal feed to enable the growth of lean muscle in them."

22.     On June 4, 2019, your affiant observed at swole-rx.com a product for sale

by SWOLESCRIPTZ that was identified by the website as: "HGH FRAG 176-191 2MG"

at a cost of $25.00 per unit.  "HGH" is a common abbreviation for human growth

hormone.  A photograph taken from the SWOLESCRIPTZ website on June 6, 2019, is

given as an illustration of the product sold. The photograph of a clear glass looking vial

with a blue lid containing a white powdery substance labeled "HGH FRAG 2 MG"

demonstrates for potential buyers the product they will receive when ordered.   See

photograph below:

10



23.     Under 21 U.S.C. § 802(41)(C)(i)(II), a substance is an anabolic steroid if it "has been, or is intended to be, marketed, or otherwise promoted in any manner suggesting that consuming it will promote muscle growth or any other pharmacological effect similar to that of testosterone." Under the "description" section for the HGH FRAG product, SWOLESCRIPTZ states that the product "is very common to weightlifters and bodybuilders because of a number of physical benefits," which includes "increase in muscle mass." At the bottom of the "description" section, SWOLESCRIPTZ issued the disclaimer "[a]ll products listed on this website are for research purposes only and are not for human consumption.

11

24.     A general disclaimer on swolescriptz.com indicates that "[t]he products we offer are intended for laboratory research use only" and that "[n]o products here are to be used for recreational purposes nor human consumption." However, their websites and associated social media presence encourage the use and distribution of various substances to promote muscle growth in humans. The name itself, SWOLESCRIPTZ, is a reference to muscle growth. "Swole" is a colloquial term, which is defined by Merriam-Webster as meaning "extremely muscular." Further, there are product sections on both swolescriptz.com and swole-rx.com that list specific products for sale to "build muscle." One such product is called "Bodybuilding Stack," but again, SWOLESCRIPTZ states that the product "IS NOT FOR HUMAN CONSUMPTION."

25.     On June 5, 2019, at approximately 1:20 p.m., investigators established surveillance in the area of 2360 East Tower Rd in Ponca City, Oklahoma. At approximately 2:20 p.m., investigators observed a black Chevrolet Silverado pickup truck, a silver Ford Fusion sedan, and a gray Dodge pickup truck parked at 2360 East Tower Rd, near the northeast corner of the property. The Dodge pickup was recognized as that belonging to and driven by TRAVIS. The other two vehicles were not recognized by investigators.

26.     At approximately 2:45 p.m., a FedEx delivery truck was observed making a delivery at 2360 East Tower Rd. The delivery driver was later contacted by investigators, and the driver indicated that he made a delivery of a FedEx envelope to TRAVIS. The delivery driver noted that he has made numerous deliveries to TRAVIS and RHYNARD.

12

The delivery driver has made deliveries both at their current location, which is a trailer at the northeast corner of the rural property owned by RHYNARD's parents, and he has made deliveries to RHYNARD up near her parents' residence outside of a cargo trailer.

27.    At approximately 4:30 p.m., investigators observed the gray Dodge pickup truck, known to be operated by TRAVIS to be parked at 1017 North Waverley, Lot 15 (Ponca City RV Park) in Ponca City, Oklahoma. The vehicle was parked, nose-first toward the **SUBJECT PREMISES**. Investigators observed an Oklahoma registration tag, EKH 589, which identifies the registered owner as TRAVIS with an address of 2360 East Tower Road, Ponca City, Oklahoma.

28.    During a subsequent interview of the FedEx deliver driver, investigators learned that this driver had been making deliveries to TRAVIS and RHYNARD for approximately five (5) years. The delivery driver stated that he makes deliveries to TRAVIS and RHYNARD once to twice a week at 2360 East Tower Road. The delivery driver stated that he has never been inside any of their addresses. TRAVIS or RHYNARD always meet him outside whether that be in the driveway of the property, at the gate, or just outside the door of the one of the numerous trailers on the property.

29.    On June 7, 2019, your affiant received information from state investigators that a FedEx delivery driver had reported that TRAVIS had a delivery from China slated to occur on this date. The label on the package indicates that the substance is phosphatidic acid, which is not an illegal substance. An open-source internet search

13

revealed dozens of phosphatidic acid retailers in the United States, causing suspicion as
to why TRAVIS would need to utilize a Chinese vendor.

30.    On November 1, 2018, TRAVIS and RHYNARD were found in possession
of several packages of illicit steroids that had been shipped from China under falsely-
labeled products.   Exhibit 35 in this investigation, seized from TRAVIS on November 1,
2018, contained the Controlled Substance, Nandrolone Deconate, disguised in "white
toast mix" with what appears to be Chinese labeling along with English labels.  See
photograph below:



31.    On June 11, 2019, law enforcement arrested TRAVIS after he left the
**SUBEJCT PREMISES**. Law enforcement observed him carry a cooler from the
**SUBJECT PREMISES**. Inside the cooler, law enforcement discovered several powders
and two glass vials with a yellow liquid similar to items seized on November 1, 2018.
TRAVIS also possessed Ritalin, which is a Schedule II controlled substance and

Anapolon, which is Schedule III controlled substance as it is an anabolic steroid.

TRAVIS also had three firearms—a pistol and two rifles—inside the vehicle.

## ROLE OF RESIDENCES AND OTHER PREMISES IN DRUG TRAFFICKING ACTIVITY

32.     Based upon my training, experience, and participation in other

investigations involving Controlled Dangerous Substances, I know the following:

a.     That drug dealers frequently keep illegal drugs, assets, records,

documents related to their drug distribution organizations, and monies derived

from the sale of illegal drugs in safe houses where they are not easily detectable by

law enforcement officials conducting investigations;

b.     That drug dealers often maintain on-hand quantities of currency in

order to maintain and finance their ongoing drug business;

c.     That drug dealers maintain books, records, receipts, notes, ledgers,

airline tickets, money orders, and other papers relating to the transportation,

ordering, sale and distribution of controlled substances, even though such

documents may be in code;

d.     That the aforementioned books, records, receipts, notes, ledgers, etc.,

are commonly maintained where the drug dealers have ready access to them, i.e.,

homes, automobiles, and safe houses;

e.     It is common for drug dealers to conceal contraband, proceeds of

drug sales, records of drug transactions, drug sources, and drug customers in

secure locations within residences, garages, storage building, safes, and safety

deposit boxes for ready access and also to conceal such items from law enforcement agencies;

       f.    That when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

       g.    That to accomplish these goals, drug dealers utilize, including but not limited to banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations and business fronts;

       h.    That drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

       i.    That drug dealers commonly take or cause to be taken photographs of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence; and

       j.    That drug dealers frequently maintain firearms to protect their product and proceeds related to the sale of illegal drugs at the residences, stash houses, and/or in vehicles used to distribute illegal drugs.

33.    In my experience, mid- to upper-level drug suppliers are intelligent, experienced, and very good at hiding how, when and where they conduct their illegal

activities. They also regularly provide the names of relatives, associates and people who work for them when providing information to bill collector's, such as landlords, banks, mortgage companies, home utility companies (i.e. OG&E, ONG, and City Water and Sewage services). They do this in an attempt to both hide the various assets, monies and contraband they have acquired and/or sell as part of their illegal drug distribution organization; as well as conceal their personal information from law enforcement.

34.     Also in my experience, mid- to upper-level drug suppliers use some type of record-keeping system to maintain a record of the many drug transactions he/she, or the people who work for the illegal drug supplier, may conduct. This is done to keep a record of customers, when the illegal drugs were sold, the quantity of illegal drugs sold, the amount of money made from selling the illegal drugs.

35.     The primary method to prevent law enforcement from seizing the above items and conducting arrests is to utilize multiple locations to store contraband and documents related to their illegal drug distribution activities. In my experience, mid- to upper-level drug suppliers at times keep drugs, drug proceeds and ledgers separate from each other. Many times this illegal drug-related evidence is separated by maintaining these items at completely separate locations, residences, other buildings/dwellings, or with involved co-conspirators.  The types of documents and records listed above are often maintained by drug suppliers and organizations at their various stash locations long after any actual controlled substances may be kept in those locations.

**PREMISES TO BE SEARCHED**

36.     The premises to be searched are described as follows and are commonly

referred to as an off-white 2015 Royal brand camper/recreational vehicle, bearing

Oklahoma tag: EKH 589, VIN: 5CZ200R37F1124066 in Kay County, State of

Oklahoma, parked at 1017 N. Waverly Lot #15, Ponca City, Kay County, Oklahoma, in

the Western District of Oklahoma.

37.     The structure located on the aforesaid property is a recreational vehicle

serving as a single family dwelling. The structure is constructed of an aluminum shell on

steel frame with three wheeled axles. The number "15" appears in black on the electrical

utility box at the side of the lot where the vehicle is parked. The dwelling has two doors,

at each end of the camper, both facing west at this time. Each door has a small glass

window. See photograph attached hereto as Exhibit "A".

**PROBABLE CAUSE TO SEARCH THE PREMISES**

38.     As discussed in more detail above, the investigation has revealed that

TRAVIS and RHYNARD are engaged in the business of distributing anabolic steroids,

human growth hormones, and other prescription medicine. TRAVIS has established his

primary residence at the **SUBJECT PREMISES.**

39.     Investigators have noted through physical and/or electronic surveillance

from June 4 to 7, 2019, the presence of TRAVIS at 1017 N. Waverly #15, Ponca City,

Oklahoma, where the **SUBJECT PREMISES** is parked and is commonly understood to

be utilized as his residence. It is the same vehicle utilized by RHYNARD and TRAVIS

on November 1, 2018, as their common residence. There they shared a pet dog, inside a

18

fenced open to the recreational vehicle. At that time, TRAVIS directed RHYNARD to locate a lock key stored in the **SUBJECT PREMISES**. RHYNARD found the key inside the **SUBJECT PREMISES**. TRAVIS then utilized that key to unlock the contents of the cargo trailer utilized at that time as a steroid laboratory.

40.    The Ponca City RV employee, Hanna Hercyk, confirmed to investigators on June 7, 2019, that TRAVIS leases 1017 N. Waverly, #15, Ponca City, Oklahoma, from Ponca City RV.   TRAVIS paid Ponca City RV $450.00 to lease the lot from May 21, 2019, to June 21, 2019.

41.    On November 1, 2018, the cargo trailer was used for the manufacturing of controlled substances and other products sold by SWOLESCRIPTZ. SWOLESCRIPTZ is a web-based business, but the cargo trailer did not have any computer on November 1, 2018. Likewise, TRAVIS and RHYNARD did not store any business records inside the cargo trailer.

42.    TRAVIS acknowledged possession of an encapsulating machine when he completed a DEA form 452 in November of 2018.  Through surveillance, TRAVIS appears to continue to be self-employed.  Through research of his websites, TRAVIS continues to market products such as HGH FRAG 176-191 a substance he warns is "NOT FOR HUMAN CONSUMPTION" on his own website to limit his liability when used by his customers, but also notes its effects on the body. On November 1, 2018, TRAVIS utilized this same property (the 2015 camper) to store the key to his illicit steroid lab operation and shared the residence with his co-conspirator RHYNARD.

19

43.     Subsequent to the search, TRAVIS and RHYNARD have continued to

operate SWOLESCRIPTZ. TRAVIS acknowledged possession of an encapsulating

machine when he completed a DEA form 452 in November of 2018.  Through

surveillance, TRAVIS and RHYNARD appear to continue to be self-employed.  Through

research of his websites, TRAVIS and RHYNARD continue to market products such as

HGH FRAG 176-191 a substance he warns is "NOT FOR HUMAN CONSUMPTION"

on his own website to limit his liability when used by his customers, but also notes its

effects on the body.  TRAVIS and RHYNARD also market products such as

"Anadswole" and "Anadarine (S4) 30MG/ML."  These products reportedly have

"androgenic and anabolic effects in animals" and are banned by the "World Anti-Doping

Agency."  Likewise, Ligandrol (LGD 4033) is described in open source reporting as a

substance that "displays robust selectivity for muscle versus prostate tissues, anabolic

activity in muscle, and anti-resorptive [sic], and anabolic activity in bone.  LGD 4033 has

been abused as a performance-enhancing drug" and is intended "for research and forensic

applications."  Ligandrol is listed on the SwoleScriptz website as being all or part of

several products including their own blends of "Quad Stack Formula" and "Bodybuilding

Stack" at $150 a bottle.  "Hard Gainers Mass Stack is said to contain "Ligandrol, YK11,

Ibutamoren."  YK11 is found on open source research described as "new steroid-SARM

hybrid.  It has a steroid structure . . . ."  Further in the description YK11 is found to

"build muscles via myostatin inhibition."  Ibutamoren is found in open source reporting

to be "an endogenous ligand for the growth hormone (GH) secretagogue receptor

(GHSR)." At a website address identified as https://proteinfactory.com, Ibutamoren, is

one of the most powerful and useful SARMS on the market. For those not familiar with

the term it is a HGH [Human Growth Hormone] supplement."

44. Many of the websites researched, and the Swole-RX.com (and/or

SwoleScripz.com) websites attempt to limit their liability as distributors of these

substances by claiming that none of these products are for human consumption. But,

labels found on the respective websites suggest that the purveyors of Swole-RX.com and

SwoleScriptz.com intend for their products to be consumed by humans. Terminology

and phrases such as "increases lean muscle mass," "increases fat breakdown," "increases

strength," "increases endurance," and "stamina," are found on the labels of products sold

that contain Ibutamoren, YK11, Ligandrol, and Andarine clearly allude to the nature of

the website with photographs of trim, muscle-bound, athletic human arms, legs and

torsos, not the hooved, pawed, and clawed animals that are the experimental labs of these

products. This is an electronic marketplace of substances intended (by TRAVIS and

RHYNARD) to be utilized by humans, where chemical experimentation and combination

is dangerously unsupervised and unregulated, promulgated by Patrick TRAVIS and

Miranda RHYNARD who have demonstrated an ability to obtain illicit Controlled

Substances, to wit: Trenbolone (Exhibit 24 in this investigation), Testosterone Propionate

(Exhibit 28), Drostanolone Propionate (Exhibit 31), Testosterone Deconate (Exhibit 32),

and others; store them, and distribute them across the United States. In the "ABOUT"

section of SwoleRX.com website, the business is described as, "a premium supplement

21

line, designed by athletes, bodybuilders, powerlifters, and nutrition guru's. made for natural and non natural competitors." Clearly, the phrase "not for human consumption" is a falsehood.

45.     Based on all the foregoing, I believe that TRAVIS and RHYNARD use the **SUBJECT PREMISES** to store proceeds from drug transactions, phone numbers, electronic devices including cell phones and computers used to facilitate the distribution of drugs, and other documentation and evidence of their drug-trafficking activity, and that other items as listed in "Attachment B" are also kept, stored, or maintained within said property.

## CONCLUSION

46.     TRAVIS and RHYNARD operate SWOLESCRIPTZ, which is in the business of trafficking anabolic steroids and other products distributed contrary to law, including prescription medicine and human growth hormones. TRAVIS and RHYNARD operate this business in reliance on an international network of individuals involved in the distribution of large quantities of Scheduled Controlled Substances and Listed Chemicals. During the course of the investigation, it became clear that those substances were imported to/and distributed from the Western District of Oklahoma through the actions of TRAVIS and RHYNARD.

47.     I believe that the described premises, its surrounding curtilage, and any vehicles, shops and outbuildings, cargo trailers, thereon, contain evidence of TRAVIS and RHYNARD's illegal activities. On the facts and circumstances of this Affidavit,

22

probable cause exists for the issuance of the search warrant requested above.  I therefore

request a search warrant for an off-white 2015 Royal brand camper/recreational vehicle,

bearing Oklahoma tag: EKH 589, VIN: 5CZ200R37F1124066 in Kay County, State of

Oklahoma, parked at 1017 N. Waverly Lot #15, Ponca City, Kay County, Oklahoma, in

the Western District of Oklahoma.


Based on the forgoing, I request that the Court issue the proposed search warrant for the

property described.


Respectfully submitted,


Jonathan Cordell
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me on _June 11___, 2019.


SUZANNE MITCHELL
United States Magistrate Judge


23

## ATTACHMENT A

### Property to Be Searched

2015 ROYAL TRAVEL TRAILER BEARING OKLHAHOMA TAG:  EKH 589, VIN: 5CZ200R37F1124066 THAT IS PARKED AT 1017 N. WAVERLY ST LOT #15, A RECREATIONAL VEHICLE (RV) PARK OTHERWISE KNOWN AS PONCA CITY RV PARK.

REFERENCE IS MADE TO THE PHOTOGRAPHS ATTACHED:





## ATTACHMENT B

### Information to Be Seized by the Government

Evidence relating to violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances); 21 U.S.C. § 841(a)(1) (manufacturing or possession with intent to distribute controlled substances); and 21 U.S.C. § 333 (distribution of human growth hormone), including:

1. Currency indicative of proceeds from the sale of controlled substances or human growth hormones;

2. Records and logs of monies owed, customer lists, sources of supply information and drug shipments accounts receivable in any medium written and/or electronic;

3. United States currency, financial instruments, precious metals, jewelry, and other items of value or proceeds of drug transactions.

4. Telephone and address books, notes, cell phones, personal computers containing telephone and addresses of conspirators or other such records, photographs and recordings, which indicate a criminal association between conspirators.

5. Any and all mobile telephones and bills or receipts relating to the leasing, rental or purchase of the mobile telephones.

6. Information relating to Post Office boxes, third party mail services (for example Stamps.com.), safety deposit boxes, and storage units.

7. Records pertaining to bank accounts, investment accounts, savings accounts and all financial records relating to the concealing of proceeds or the receipt, investment or

disbursement of proceeds, including records of domestic and foreign money transactions or records of the transfer of funds within or into and out of the United States. This includes the following:

    a. Evidence of income, obtaining, secreting, transferring or the concealment of assets; or the secreting, transfer, concealment or expenditure of money including, cash, precious metals, credit card receipts, wire transfers, money transfers, retained copies of Federal and State Tax Returns, journals, cash receipt books, cash disbursement books, expense records, business ledgers reflecting accounts and notes receivables, account payables, notes payable and closing ledgers, bank ledger sheets, bank statements, bank correspondence, deposits and withdrawal tickets, cancelled checks, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans, records of any liens, loan correspondence files, bank memoranda, purchase invoices, copies of receipts covering payment of fees or expenses, copies of invoices and bills, records of real estate transactions, rentals, purchase or lease agreements for real or personal property, records of the acquisition or sale of vehicles, boats and aircraft, bank passbooks, money drafts, cashier's checks, bank checks, safes, briefcases, suitcases, storage

boxes, safe deposit box records and keys, mutual and money market fund statements, stock or bond purchase records, ledgers, invoices and receipts, receipts or other records pertaining to wire transfers, receipts or other records pertaining to transactions within the United Sates or outside of the United States, including any foreign or off-shore accounts, investments, and trusts; and

b. Books, records, receipts, personal computers, computer discs and hard drives, printouts, programs, and other items evidencing the obtaining, transfer, laundering, concealment or expenditure of funds or other assets for the purchase of vehicles and real estate or indicating ownership of the vehicles and real estate.

8. Papers, passports, visas or other travel documents, identification cards or papers, driver's licenses, tickets, notes, receipts and other items relating to travel expenditures.

9. Drug records for the organization, in particular, drug ledgers, account books, notes, names or code names or nicknames, or identifying information reflecting customers, amounts of drugs bought and sold, and amounts of money paid, owed or collected.

10. The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including CD-ROMs,

27

optical discs, thumb drives, smart cards, memory, calculators, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, prints, negatives, videos, photocopies).

11. Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

    a. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

        i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as

well as evidence of the presence or absence of security
software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated
data) that are designed to eliminate data from the device

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that
may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or
other software, as well as documentation and manuals,
that may be necessary to access the device or to conduct a
forensic examination of it;

viii. records of or information about Internet Protocol
addresses used by the device;

ix. records of or information about the device's Internet
activity, including firewall logs, caches, browser history
and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

b. As used herein, the terms "records," "documents," "programs,"
"applications," and "materials" include records, documents, programs,

29

applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

c. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

12. All firearms and ammunition.